## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

Eric. E. Bernard,

                Plaintiff,

      v.

Roger Scott, et al.,

                Defendants.

Case No. 3:15-cv-50277

Honorable Iain D. Johnston

## MEMORANDUM OPINION AND ORDER

Plaintiff Eric E. Bernard ("Bernard") brought this action under 42 U.S.C. § 1983 against a slew of individuals responsible for operations and policymaking at the DeKalb County Jail ("the jail"). Dkt. 19. He claims that the Defendants violated his rights under the First, Eighth, and Fourteenth Amendments during both pretrial and post-conviction detentions because the jail failed to provide him access to a psychiatrist, kept him in administrative segregation, and otherwise failed to provide adequate healthcare. He further contends that the jail discriminated against him and failed to provide him appropriate access to religious services. He seeks declaratory, injunctive, and monetary relief. *Id.* ¶¶ 1, 4. On August 26, 2019, Defendants filed a motion for summary judgment. Dkt. 119. A day later, Bernard filed a motion for partial summary judgment. Dkt. 132.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Because Defendants' conduct here easily falls within the acceptable range, Defendants'

motion for summary judgment is granted in full and Bernard's motion for partial summary judgment is denied.

## I. Background

With almost no exception, the facts listed here come from the statements of undisputed facts. Bernard, currently an inmate at Dixon Correctional Center,[1] is serving a 55-year sentence for armed robbery. Dkt. 149, ¶ 93. For the purpose of this suit, the only relevant times are those when he was housed in the DeKalb County Jail. Several such instances exist. For reasons never explained, Bernard was shuttled back and forth between IDOC and DeKalb County Jail. Specifically, he was briefly booked into the jail on November 3, 2011, for the purpose of being served with a warrant. He was released the same day. *Id.* ¶ 29. He was then booked into the jail on August 2, 2012, and was then transferred back to the Illinois Department of Corrections (IDOC) the next day. *Id.* ¶¶ 30, 33. He was again detained in the jail from October 9, 2012, until October 12, 2012. *Id.* ¶ 34. Bernard was again detained in the jail from November 14, 2012, *id.* ¶¶ 37–38, until March 21, 2014, *id.* ¶ 94. During these initial stays at the jail, Bernard was a pretrial detainee. *Id.* ¶ 100. Finally, he was brought back to the jail during his post-conviction proceedings from May 31, 2016 until June 14, 2016.[2] *Id.* ¶ 106.

---

[1] A search of the Illinois Department of Corrections official website reveals that Eric Bernard is currently housed at Dixon Correctional and is serving a sentence on a number of charges including armed robbery with a firearm. He is the only Eric Bernard in the system. https://www2.illinois.gov/idoc/Offender/pages/inmatesearch.aspx.

[2] Bernard's conviction was upheld on appeal on April 2, 2018. Dkt. 149, ¶ 137.

At this point, a recitation of the various defendants and their roles is helpful. Defendant County of DeKalb, Illinois, owns the DeKalb County Jail. Dkt. 145, ¶ 2. Defendant Dekalb County Sheriff's Office is responsible for the jail. *Id.* Defendant Roger Scott is the Sheriff of Dekalb County and has policymaking responsibility over the jail, *id.* ¶ 3, though he is not involved in daily operations, Dkt. 149, ¶ 12. Defendant Joyce Klein is the Chief of Corrections and is responsible for the "oversight of operations," Dkt. 145, ¶ 4, though her involvement in day-to-day operations is minimal, Dkt. 149, ¶ 11. She has been in that role since February of 2015, when she was promoted from Lieutenant. Dkt. 145, ¶ 4. She reports directly to Sheriff Scott. *Id.* Defendant Lieutenant Carolyn Parnow is responsible for the daily operations of the jail—beginning in February 2016. *Id.* ¶ 7; Dkt. 149, ¶ 3. She reports to Chief Klein. Dkt. 145, ¶ 20. Defendants Craig Malone, Erin McRoberts, Kelly King, Michael Emmer, T.R. Smith, Krista Haberkamp, Sue Ballard, Dawn Cook, Ryan Fox, and Sarah Floyel were at all relevant times correctional officers with the DeKalb County Sheriff's Office. *Id.*, ¶ 6; Dkt. 149, ¶ 2.

Bernard also names John and Jane Does in his complaint, though they are not mentioned in his memorandum in support of his motion for partial summary judgment. Dkt. 133. Bernard does not sue any medical personnel or contractors in this action. Dkt. 19.

The jail's medical services to inmates was at all relevant times provided by Guardian Correctional Care ("Guardian"). Dkt. 149, ¶¶ 13–14. The medical staff provided by Guardian included nurses and a physician. *Id.* ¶¶ 13, 15. The jail also

3

contracted with two Qualified Mental Health Counselors (QMHC). *Id.* ¶ 16. The provided mental health services included substance abuse counseling, mental health counseling, personal counseling, and a life skills course. *Id.* ¶ 18. Although the mental health counselors could not prescribe medication, they could refer their patients to the Guardian medical staff, which included a physician. Dkt. 145, ¶ 48; Dkt. 149, ¶ 15. Corrections officers are also trained annually on how to deal with inmate mental health issues and suicide prevention. *Id.* ¶ 28. Still, correctional offices rely on the QMHCs to provide inmate counseling. *Id.* 25.

Bernard has been, and was at all relevant times, diagnosed with several mental health conditions for which he was prescribed medication. Dkt. 145, ¶¶ 12–13. Defendants were at least aware of Bernard's conditions and medications by 2012. Bernard's August 2012 transfer paperwork from IDOC indicated a psychiatric history and medications. Dkt. 149, ¶ 31. During his October 2012 intake, he self-reported his medications and psychiatric history. *Id.* ¶ 35. Still, he refused his medications during both his August and his October detentions. *Id.* ¶ 32, 36.

The jail's standard procedure during Bernard's detention called for medication to be distributed by trained non-medical staff (i.e., corrections officers). Dkt. 145 ¶ 53. But this medication was first verified by Guardian medical staff. Dkt. 149, ¶¶ 21, 39. Shortly after being booked in the jail in November 2012, Bernard submitted a medical request complaining about the size of his pills and wanting to change the time that he took one of his medications. *Id.* ¶ 40. Medical staff then confirmed that he was receiving his medications as prescribed, but Bernard again

4

refused his medication through November 24, 2012. *Id.* ¶¶ 41–43. On November 24, he complained to a corrections officer about the amount prescribed of one of his medications. That complaint was then referred to medical staff, who then changed the dosage. *Id.* ¶ 44. Still, Bernard continued to refuse his medications through the rest of 2012. *Id.* ¶ 45.

On January 2, 2013, defendant Sergeant McRoberts wrote to the medical staff about Bernard's continued refusal to take his medication. *Id.* ¶ 46. In response, a nurse attempted to get Bernard to sign paperwork noting his refusals. Instead of signing, Bernard agreed to take half doses of certain medications. *Id.* ¶ 47. Despite this agreement, which was approved by medical staff, Bernard continued to refuse his medications through March 2013. *Id.* ¶¶ 48–49.

On March 25, 2013, a nurse and a corrections sergeant went to Bernard's cell to discuss these continued refusals, but Bernard again stated an unwillingness to take his medications. *Id.* ¶ 50. On May 15, 2013, Bernard requested to see a psychologist or psychiatrist. *Id.* ¶ 51. A day later, he was seen by medical staff, at the request of Sergeant McRoberts, to discuss his medications. In that meeting, Bernard complained to medical staff that he thought he was being given the wrong medications. *Id.* ¶ 52. In response, Sergeant McRoberts coordinated with IDOC and confirmed that the medications Bernard was being given matched the prescriptions IDOC had on file. *Id.* ¶¶ 53–54. On May 20, 2013, Bernard again submitted a request to see a psychiatrist. *Id.* ¶ 57. That request was instead referred to mental health counselor Kent Wohlrabe. *Id.* ¶ 58. On May 25, 2013, Kent Wohlrabe saw

and evaluated Bernard, but Bernard did not want to talk to anyone other than a psychiatrist. *Id.* ¶ 56, 61.

On May 27, 2013, Bernard again submitted a medical request to see a psychiatrist or psychologist. Dkt. 149, ¶ 62. On referral from the jail's medical staff, Bernard was then seen by psychiatrist Dr. Brown at the Ben Gordon Center two days later on May 29, 2013. Dkt. 145, ¶ 16; Dkt. 149, ¶ 63–64. The resulting psychiatric evaluation does not appear to have been reviewed by Chief Klein or Lt. Parnow. Dkt. 145, ¶ 19. Still, Dr. Brown told defendant Sergeant McRoberts that Bernard was refusing to take his medication at that time but that a follow up appointment should be scheduled. Dkt. 149, ¶ 65. Though Sergeant McRoberts did schedule the follow-up appointment for June 5, 2013, the record does not clearly indicate whether Bernard attended that appointment. *Id.* ¶ 66.[3]

After his visit with Dr. Brown, Bernard complained of the isolation and asked to be housed with other inmates, but that request was denied. *Id.* ¶¶ 67–68. He reiterated this request on September 10, 2013. *Id.* ¶ 75. On September 29, 2013, Bernard requested mental health treatment based on the stress from being housed in isolation. *Id.* ¶ 76. Kent Wohlrabe, the mental health counselor, then met with Bernard that same day. *Id.* ¶ 77. Mr. Wohlrabe then recommended that Bernard be housed with other inmates, and he continued to meet with Bernard periodically

---

[3] At times, Bernard was also treated for other issues. He requested to be seen for an ear infection on July 24, 2013, but refused to see medical staff the next day. Dkt. 149, ¶¶ 69–70. He was then seen and prescribed medication on July 31, 2013 for the infection. *Id.* ¶ 71. He complained again for the same reason on August 15, 2013, and was seen the same day and provided medication. *Id.* ¶ 72. After complaining of blurry vision, he was seen by medical staff and provided with medication and eyeglasses. *Id.* ¶¶ 91–92. Notwithstanding this seemingly helpful medical support, he continued to refuse to take his medication. *Id.* ¶¶ 73–74.

thereafter. *Id.* ¶¶ 78–79; Dkt. 145, ¶ 40; Dkt. 163, ¶ 6. Bernard filed additional grievances about his housing status on October 8 and 10, 2013. Dkt. 149, ¶ 80. Shortly thereafter, Chief Klein and Lt. Parnow decided to start housing other detainees on Bernard's cell block. The reason for this decision is not made clear from the parties' statements of undisputed facts. *Id.* ¶ 81.

But regardless of the reasoning, other detainees were in fact housed on Bernard's cell block beginning on October 26, 2013 and until he left the jail on March 21, 2014. *Id.* ¶ 83. First, the jail placed an inmate on Bernard's block from October 26, 2013 until April 4, 2014. *Id.* Another inmate was housed on Bernard's block from December 16, 2013, until December 26, 2013. *Id.* ¶ 86. Another inmate was housed on the same block from December 18, 2013, until January 6, 2014. *Id.* ¶ 85. Yet another inmate was housed on the same block from January 17, 2014, until January 23, 2014. *Id.* ¶ 84. A white inmate was also housed on Bernard's block from December 22, 2013, until February 14, 2014. *Id.* ¶ 87. Following his conviction for armed robbery and subsequent 55-year sentence, Bernard left the jail on March 21, 2014, and entered IDOC custody. *Id.* ¶¶ 93–94.

Bernard was also detained in the jail from May 31, 2016, until June 14, 2016, after the filing of this action, this time for post-conviction proceedings. Dkt. 149, ¶ 106. But he amended his complaint in October 2016, to include the allegation that he was so detained. Dkt. 19. Assuming that brief statement is enough to allege a new violation of Bernard's rights, the facts are very similar to his previous stint at the jail. Bernard reported on intake that he had a history of mental health issues

and that he was taking medication. Dkt. 149, ¶ 108. Those medications were again approved on June 1, 2016. *Id.* ¶ 109. Still, Bernard periodically refused his medications because he did not trust correctional officers.[4] *Id.* ¶¶ 124, 128. Bernard then again asked to see a psychiatrist but was referred to a nurse and a mental health counselor—though he insisted on seeing a psychiatrist with the ability to prescribe medication. *Id.* ¶ 110–11.

Five days after being seen by the mental health counselor, Bernard submitted a medical request stating that his medication was making him sick, and he again asked to see a psychiatrist. *Id.* ¶ 113–14. Kent Wohlrabe, the mental health counselor, tried to engage with Bernard, but he was insistent that he wanted to see a psychiatrist or psychologist. *Id.* ¶ 115–19. Bernard again complained that his medication was making him feel sick, and medical staff again referred him to counseling but also prescribed additional medication. *Id.* ¶ 118. Bernard again asked to see a psychiatrist on June 10 and 11, 2016, and he added that medical staff and not deputies should be dispensing medications. *Id.* ¶¶ 120–21. He also complained about his medication dosage and their side effects. *Id.* ¶ 122. These requests were referred to Lt. Parnow. *Id.* ¶¶ 120–23.

On June 13, 2016, Bernard was then seen by medical staff and one of his medications was changed to the "extended release" version. *Id.* ¶ 123. Notwithstanding the treatment from medical staff and the mental health counselor, Lt. Parnow attempted to find Bernard a psychiatrist. Specifically, Lt. Parnow

---

[4] Bernard admits that correctional staff "documented that he refused to take his medications for days or weeks—up to over a month—at a time." Dkt. 133, at 6.

contacted three psychiatrists, but was unable to find one available to see Bernard before he was transferred out of the jail on June 14, 2016. *Id.* ¶ 125–27.

Before being housed at the jail, Bernard had been convicted of multiple felonies, including assault of peace officers and for escape. *Id.* ¶ 99. Based on Bernard's prior criminal convictions, his previous escape from custody, and concerns for jail safety and security, the jail placed Bernard on "administrative segregation," which meant he was initially housed alone on his own cell block. *Id.* ¶¶ 103–04; Dkt. 145, ¶¶ 22, 27–32. In fact, in Bernard's prior conviction for escape, he and other inmates conspired with a corrections officer, set a fire in the Cook County Jail, and assaulted officers. Dkt. 145, ¶ 31; *People v. Gater*, 2014 IL. App. (1st) 101982-U (Ill. App. Ct. June 30, 2014).[5] Furthermore, Bernard was disciplined while detained in the jail seven times for, among other things, disrespecting and threatening an officer. Dkt. 157, ¶ 7.

Bernard asserts that his status never changed away from administrative segregation, but regardless of any official classification, he was not housed separately beginning on October 26, 2013, through his pretrial release date of March 21, 2014. Dkt. 145, ¶¶ 21, 46; Dkt. 149, ¶¶ 83–87.[6] During Bernard's post-conviction proceedings in 2016, when he returned to the jail, he was again placed on administrative segregation for similar reasons. Dkt. 149, ¶¶ 106–07. Administrative

---

[5] Defendants contend that they had heard from Cook County Jail that Bernard was a high-risk inmate with a history of escape that included assault, aggravated battery, and aggravated arson. Dkt. 145, ¶ 30; Dkt. 149, ¶ 102. They further note that, while Bernard's behavior in custody was not a concern, they considered his behavior in the DeKalb County courtroom. Dkt. 145, ¶ 29.

[6] At no point did Bernard have a cellmate at DeKalb County Jail. Dkt. 145, ¶ 35. But he was housed in the same cell block with other inmates beginning in late October 2013 and until he left the jail in March 2014. *Id.* ¶ 21.

staff viewed this classification as meaning that "the inmate is kept separate from others, but they have all their privileges in place." Dkt. 145, ¶ 27. Bernard contends that this isolation worsened his mental health issues, and that Lt. Parnow was aware that the isolation was a source of stress for him. *Id.* ¶¶ 38–39. Furthermore, Bernard points out that Lt. Parnow could not recall any discussion of the impact of such isolation on Bernard's mental health when determining his classification status. *Id.* ¶ 37.

Bernard also points to a memorandum authored by Lt. Parnow instructing staff "to be wary of Plaintiff Bernard's requests for medical attention." Dkt. 145, ¶ 63. She noted that staff should "[p]ay special attention to requests for medical attention" because Bernard "had used medical reasons as methods for escape." *Id.* Memoranda to this effect were distributed both during Bernard's pretrial detention and his post-conviction proceedings. *Id.* ¶ 64.

At times, Bernard also submitted requests to attend religious services with other inmates. The record is not clear as to whether Bernard was informed that he could attend services with other inmates, but he was at least offered one-on-one services, which he refused to attend. *Id.* ¶¶ 88–89. Still, the one-on-one services provide the same features, they just did not allow for socializing with other inmates. *Id.* ¶ 90.

In his complaint, Bernard argues that he was treated differently because of his status as a pro se litigant. The undisputed facts, however, show that Sheriff Scott was unaware of his claims. Dkt. 148, ¶ 130. Still, Chief Klein and Lt. Parnow

10

seem to have been aware of his claims. Dkt. 149, ¶ 131. Bernard also contends in his response to Defendants facts that Defendant Haberkamp threatened to tamper with his medications. *Id.* ¶ 131. Still, Bernard stated in his deposition that he could not recall any conversations with Defendant Haberkamp specifically about Bernard's pro se status as a criminal defendant or his other discrimination claims. Bernard Dep. 79:8–80:5. Thus, on this point, some dispute appears to exist.

Defendants contend that much of Bernard's complaint is barred by the statute of limitations. Bernard argues for the application of the continuing violation doctrine, such that his claims are not time barred. Bernard then argues that Defendants violated his First Amendment right to free exercise of religion and his Eighth and Fourteenth Amendment rights to adequate healthcare. Specifically, Bernard challenges the adequacy of his access to appropriate mental health professionals, he challenges his detention in administrative segregation, he contends that he was discriminated against, and he argues that gaps in policy amount to *Monell* violations. Defendants also argue that Bernard's prayer for injunctive relief is moot because he is no longer housed at the jail. They further argue that they are entitled to qualified immunity.

## II. Discussion

Before the Court are cross motions for summary judgment. Defendants ask for summary judgment in full, and Bernard moves the Court for partial summary judgment as to his claims under the Eighth Amendment, the Fourteenth Amendment, and under *Monell*. Dkt. 133, at 5. The Court reviews the undisputed

11

evidence and draws all reasonable inferences in favor of the non-moving party. *Karim v. Obaisi*, No. 14 C 1318, 2017 U.S. Dist. LEXIS 149383, at \*10 (N.D. Ill. Sep. 14, 2017). But "[w]here two parties tell two different stories, one of which has no support in the record, the Court does not adopt the unsupported version of the facts." *Id.* at \*11. Summary judgment is then appropriate only if no genuine disputes of material fact exist and the movant is entitled to judgment as a matter of law. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 963 (7th Cir. 2019).

### A. Continuing Violation Doctrine

Bernard originally filed his claim on October 23, 2015. Defendants argue that all claims accruing before October 23, 2013, are time-barred. Dkt. 120, at 8. Bernard responds that his claims amount to continuing violations by Defendants that reach into the limitations period. Dkt. 148, at 7.

In Illinois, the statute of limitations period for § 1983 claims is two years, and that limitations period is not tolled for prisoners. *Green v. Wexford Health Sources*, No. 12-cv-50130, 2013 U.S. Dist. LEXIS 97904, at \*2–3 (N.D. Ill. July 12, 2013) (citing *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) and *Schweihs v. Burdick*, 96 F.3d 917, 919 (7th Cir. 1996)). Thus, unless an exception applies, all alleged violations before October 23, 2013, are barred by the statute of limitations. The continuing violation doctrine invoked by Bernard, which can act to modify the limitations period, is better understood as three distinct doctrines. These are (1) the genuine continuing violation doctrine, (2) the cumulative violation doctrine, and (3)

12

the continuing injury doctrine. *Turley v. Rednour*, 729 F.3d 645, 654 (7th Cir. 2013) (Easterbrook, J., concurring).

Before *Turley*, the Seventh Circuit had described the continuing violations doctrine as "misnamed," and that it protects from cumulative violations. *Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008). In *Limestone*, the Seventh Circuit explained that the statute of limitations runs from the moment of injury or the discovery of the injury, and that it is not tolled by subsequent injuries. Instead, the purpose of the continuing violation doctrine, according to the *Limestone* Court, is "to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." *Id.* (citing *Heard v. Sheahan*, 253 F.3d 316, 319–20 (7th Cir. 2001)). This analysis seems to indicate that the only type of continuing violation doctrine that exists is the cumulative violation type. But the concurrence in *Turley* indicates otherwise and provides a clearer synthesis of the three distinct forms.

The first is the genuine continuing violation, which exists when the defendant commits discrete but repeated violations. *Turley*, 729 F.3d at 654. The second is the cumulative violation, which is based on injuries that accrue over time. In those situations, a series of small misdeeds that would not constitute violations in isolation accumulate to form one violation that is sufficient to constitute cognizable injury. *Id.* In other words, cumulative violations are ones that take time to develop. The period of limitations then begins once the harm accumulates enough to create a claim. Finally, continuing injuries are those in which a "discrete

13

wrongful act causes continuing harm." *Id.* These continuing injuries do not extend the period of limitations. Once the harmed party is on notice, the claim accrues, and the fact that the injury continues to exist does not extend the deadline to file a complaint. *Id.* ("*Morgan* and *Ledbetter* hold that a continuation of injury does not extend the period of limitations.").

While the second and third types are clear, the genuine continuing violation doctrine adds even more ambiguity. On the one hand, "[t]he period of limitations runs from each independently unlawful act or failure to act." *Id.* On the other hand, the period of limitations does not run independently for each act when the plaintiff cannot reasonably be expected to file suit for each independent violation. *Selan v. Kiley*, 969 F.2d 560, 565–66 (7th Cir. 1992) ("What justifies treating a series of separate violations as a continuing violation? Only that it would have been unreasonable to require the plaintiff to sue separately on each one."). The genuine continuing violation doctrine is also applied when the "state actor has a policy or practice that brings with it a fresh violation each day." *See Wood v. City of Granite City*, 2019 U.S. Dist. LEXIS 49459, at *13 (S.D. Ill. Mar. 25, 2019) (citing *Reese v. Ice Cream Specialties, Inc.*, 347 F.3d 1004, 1012–14 (7th Cir. 2003)).

In *Wilson v. Wexford Health Sources, Inc.*, the Seventh Circuit explained that a "section 1983 Eighth Amendment claim based on deliberate indifference in the delivery of medical care does not necessarily allege a single event or a series of events, but may describe an ongoing denial of care." 932 F.3d 513, 517 (7th Cir. 2019) (citing *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2013)). These types of

14

cases are instances of "continuing violations" that last as long as the "defendant [has] the power" to remedy the plaintiff's condition but fails to do so.[7] *Id.* at 517–18; *see also Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013) ("For continuing Eighth Amendment violations, the two-year period starts to run (that is, the cause of the action accrues) from the date of the last incidence of that violation, not the first."). But even if the violation is considered "continuing," such violation will at least end when the inmate is released. *See Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1012 (N.D. Ill. 2015).

   As noted above, Bernard was detained at the jail on November 3, 2011, but he left the jail that day. He was again detained on August 2, 2012, but was then transferred the next day to another facility. He was again detained at the jail from October 9, 2012, until October 12, 2012. Any claims Bernard had based on his stays in the jail during those times at least accrued when he was released or transferred each time. Because he did not file this action until October 23, 2015, well beyond the limitations period, any of his claims that pertain to those detentions are time barred.

   Bernard's pretrial detention in 2013 and 2014, however, presents a different picture. He was no longer housed alone starting on October 26, 2013, which means his claims related to such segregation reaches into the limitations period—October

---

[7] The Court recognizes that pretrial claims are confined to the objectively reasonable test under the Fourteenth Amendment and that the Eighth Amendment protects convicted persons. But for the purpose of the continuing violation doctrine, the analysis is the same because the doctrine applies generally to legal claims that run afoul of statutes of limitation. For helpful background on this doctrine and to see how it applies generally instead of to a discrete area of law, see generally Kyle Graham, *The Continuing Violations Doctrine*, 43 GONZ. L. REV. 271 (2007).

23, 2013 to October 23, 2015—by three days. Because this claim is based on a claim of inadequate healthcare, the alleged violation is one that continues until Defendants remedy the error or Plaintiff leaves their custody. *See Wilson*, 932 F.3d at 517; *Ruiz*, 144 F. Supp. 3d at 1012. In this case, Defendants did not remedy the alleged error even in part until October 26, 2013, so the claims associated with that detention are not barred by the statute of limitations.

### B. Mental Health Claim

Bernard argues that his lack of access to a psychiatrist presents a violation of his Eighth Amendment and Fourteenth Amendment right to be free from cruel and unusual punishment. But his Eighth Amendment claim assumes he was being punished in the first place. Bernard does not dispute that his detention in the jail before 2016 was a pretrial detention and that he was not there to serve a sentence. His detention in the jail in 2016, however, did take place while serving his sentence for armed robbery. He was there during post-conviction proceedings.

Although detention in county jail awaiting trial may feel the same as punishment, it is not punishment for the purpose of the Eighth Amendment. *Tesch v. County of Green Lake*, 157 F.3d 465, 472–73 (7th Cir. 1998). Inmates serving a post-conviction sentence are protected by the Eighth Amendment's prohibition against cruel and unusual punishment. But state pretrial detainees cannot rely on that amendment. *Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018) ("Pretrial detainees stand in a different position: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence.

16

Thus, the punishment model is inappropriate for them."). But that does not leave pretrial detainees unprotected. "The difference is that the claims of state detainees being held on probable cause arise under the Fourteenth Amendment's Due Process Clause. *Id.* (citing *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017)). Thus, if Bernard has a cognizable Eighth Amendment claim, it must be for his 2016 post-conviction detention. Still, his earlier pretrial claims may lie under the Fourteenth Amendment's Due Process Clause.

### 1. Pretrial Detention

In the past, the Seventh Circuit has considered Fourteenth Amendment and Eighth Amendment claims for inadequate medical treatment to be "functionally indistinguishable." *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). But that is no longer the case. While Eighth Amendment claims are still analyzed under the deliberate indifference subjective test, Fourteenth Amendment claims for inadequate medical care are analyzed only under the objective unreasonableness test identified in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Id.*; *see also Pittman v. Cty. of Madison*, 970 F.3d 823, 827 (7th Cir. 2020).

Bernard's inadequate medical treatment claims during his 2013 to 2014 stay at the jail fall under the objective reasonableness test identified in *Miranda* because he was a pretrial detainee. This does not mean that his constitutional protections are lessened during his pretrial detention. Pretrial detainees have rights "at least as great" as convicted prisoners have under the Eighth Amendment. *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008). After *Miranda*, the Court must answer

two questions for Bernard's Fourteenth Amendment claim. First. the Court must determine whether the Defendants "acted purposefully, knowingly, or perhaps even recklessly." *Pittman*, 970 F.3d at 827 (quoting *Miranda*, 900 F.3d at 352). In other words, the Defendants' actions must "rise above negligence and resemble something akin to reckless disregard." *Ferguson v. Cook Cty. Correctional Facility/Cermak*, No. 20-1185, 2020 U.S. App. LEXIS 35702, at *4 (7th Cir. Nov. 13, 2020) (quoting *Miranda*, 900 F.3d at 353). Second, the Court must decide whether the Defendants' actions were "objectively reasonable." *Pittman*, 970 F.3d at 827.

Here, while the undisputed facts leave questions unanswered, the answers to the questions would not change the outcome. Bernard has identified no evidence of recklessness on the part of any defendant, or that indicates that their actions were anything other than objectively reasonable. Bernard contends that his access to mental healthcare was insufficient. But the jail contracted with Guardian to provide nursing staff and a physician capable of prescribing and altering medication. The jail also provided Bernard access to mental health counseling services.

Although the jail did not provide Bernard with on-demand access to a psychiatrist as he wished, they did afford him a visit with a psychiatrist in 2013. And regardless, Bernard is not entitled to demand specific care. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (explaining that "[t]he Constitution is not a medical code that mandates specific medical treatment"). The record indicates that the psychiatrist requested a follow-up visit with Bernard, and that Sergeant McRoberts

18

did schedule a follow-up. Still, undisputed facts do not make clear that Bernard attended that appointment. If he did not attend, the undisputed facts do not say why. Was his absence due to his own fault? Was the jail staff to blame? Did Dr. Brown reschedule? The answers to these questions are either disputed or not addressed by the parties.

But the jail provided ample counseling services and access to a physician with prescribing capability. As already noted, Bernard does not have the right to demand specific care. Given that he did not have a right to demand a psychiatrist visit when he was already provided with a physician, any deficiency by the jail in ensuring Bernard attended the follow-up appointment with Dr. Brown would fall short of reckless disregard.

Bernard requested medical care on a number of occasions. The correctional officers referred those requests to medical staff and medical staff responded, often within days if not the same day. To the extent that the correctional officers were slow to respond to his requests, such delay would again amount, at most, to negligence—far short of recklessly disregarding Bernard's needs.

Furthermore, none of the Defendants were directly responsible for medical care of any detainee. Bernard sues correctional officers and jail administration. Although some have policymaking authority, Defendants rely on Guardian staff and mental health counselors to provide medical and mental health expertise. Correctional officers merely refer requests to medical and mental health staff, and Bernard has identified no evidence that they ever failed to refer his requests. Jail

administration, likewise, relies on the same staff by contracting with them and by training their correctional officers to refer requests to the experts. Because the law encourages non-medical professionals to rely on the professional judgment of medical professionals, *Leiser v. Kloth*, 933 F.3d 696, 705 (7th Cir. 2019), Defendants' reliance on mental and medical experts cannot be deemed objectively unreasonable.

## 2. Post-Conviction Proceedings

Bernard's post-conviction stay at the jail is protected by the Eighth Amendment prohibition against deliberate indifference to a substantial risk of serious injury or medical need. *Rice v. Wexford Health Sources, Inc.*, No. 14 C 4978, 2016 U.S. Dist. LEXIS 11162, at *9 (N.D. Ill. 2016). The deliberate indifference test presents two elements. First, plaintiffs must have had an objectively serious injury or medical need. Second, defendants must have known that the risk of injury was substantial but still failed to take reasonable preventative measures. *Id*.

For the purpose of the summary judgment motions, Defendants do not dispute the serious nature of Bernard's mental illnesses. Instead, they contend that Bernard cannot show that Defendants had a sufficiently culpable state of mind, such that he could satisfy the second prong of the test. Dkt. 120, at 15. Essentially, this standard is the same for pretrial detainees except that plaintiffs must show that the defendants were subjectively indifferent to the serious medical need.

This second element of the test requires that the defendants were aware of the risk to the plaintiff and consciously disregarded that risk. *Rice*, 2016 U.S. Dist. LEXIS 11162, at *9. This requires a showing above negligence—even above gross

20

negligence—such that defendants exhibited a serious lack of concern for the plaintiff's welfare. *Rosario v. Brawn*, 670 F.3d 821, 816, 821–22 (7th Cir. 2012) (explaining that the standard requires that Defendants' action approach "total unconcern" for the Plaintiff's welfare); *Gibson v. Ramsey*, No. 99 C 5315, 2004 U.S. Dist. LEXIS 1128, at *22 (N.D. Ill. Jan 29, 2004). This is a high hurdle for plaintiff to meet. *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1131 (N.D. Ill. 2019). This is especially true because the Court allows deference to medical decisions. Furthermore, plaintiffs are not entitled to the best possible care and are not entitled to demand specific care. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (explaining that "medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference").

As stated above, non-medical jail officials are always encouraged to rely on the medical judgment of those persons trained to give such opinions. The law insulates jail officials when their actions amount to deference to medical professionals. Those officials manifest neither subjective indifference nor objective indifference to the medical needs of prisoners when they rely on the reasonable advice of medical staff. In such cases, the non-medical staff will not be liable for any resulting injury. *Boey v. Briley*, No. 02 C 4693, 2003 U.S. Dist. LEXIS 18730, at *22 (N.D. Ill. Oct. 30, 2003) (quoting *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002)).

Here, Bernard cannot satisfy this exacting standard—the Defendants were not subjectively indifferent. Bernard's Eighth Amendment claim is limited to his post-conviction stay at the jail. This was only from May 31, 2016, until June 14, 2016. During this time, the jail educated themselves as to Bernard's status by asking him about medication and medical issues on intake. They provided Bernard access to a qualified mental health counselor. They provided him with access to a competent medical staff. Even though Bernard is not entitled to demand specific care, Lt. Parnow exceeded her constitutional mandate by reaching out to multiple psychiatrists in an attempt to offer Bernard the service he desired. Still, Lt. Parnow was not able to secure a psychiatrist for Bernard before he left the jail on June 14, 2016—about two weeks after his arrival. Nothing in these facts, even in the light most favorable to Bernard, shows a sufficiently culpable state of mind on the part of Defendants. The non-medical defendants here cannot be held to be deliberately indifferent because they provided access to medical professionals, relied on the judgment of those professionals, and even sought out additional resources for Bernard. Thus, Bernard's post-conviction Eighth Amendment claims must fail.

### 3. Policy Arguments

Bernard also contends that the jail was at fault for failing to have certain policies in place. Bernard does not clearly explain which defendants he sues for which claims. But to the extent that this argument is different than his *Monell* claim discussed below, the Court recognizes that Sheriff Scott is the individual

defendant with policymaking authority over the jail and would be the proper defendant for these policy claims.

Still, the argument is not persuasive. Regardless of any official policy, Defendants' response to Bernard's refusals were imminently reasonable. The mental health counselor tried to answer his concerns, the corrections and medical staff tried to speak with him about the issue, he visited the Ben Gordon Center's psychiatrist, and the jail verified that the medications were correct with the Illinois Department of Corrections. Furthermore, the jail's medical staff even changed the dosages of Bernard's medication to attempt to alleviate his concerns. Still, Bernard consciously chose to refuse his medications. Based on these facts, the jail's treatment of Bernard falls well short of meeting either the subjective or the objective standards.

Bernard also argues that the jail should not have allowed correctional officers to dispense prescription medication. But this argument also misses the mark. In *McCann v. Ogle Cty.*, a nurse was found to have acted objectively reasonable by relying on the prescription issued by a doctor when she gave the pretrial detainee a dose of methadone that resulted in a fatal overdose. 909 F.3d 881, 887 (7th Cir. 2018). If a nurse is constitutionally permitted to rely on the judgment of the prescribing physician, then correctional officers should be allowed the same reliance. While a nurse is likely more skilled at identifying medication, the mere distribution of such medication by trained correctional officers is not so unreasonable that it amounts to constitutional error. *Jackson v. Litscher*, No. 15-C-

23

358, 2017 U.S. Dist. LEXIS 206543, at *11–12 (E.D. Wisc. Dec. 15, 2017) (dismissing a similar claim where correctional officers dispensed medication after being trained to do so and where the plaintiff had "mistakenly received the wrong medication on three occasions").

### C. Administrative Segregation Claim

Bernard challenges his classification as administratively segregated and that the jail failed to properly consider his mental health conditions in making this classification decision. Defendants argue that they placed Bernard in administrative segregation because of his history of escape and violence. Thus, they continue, such classification was necessary to ensure jail safety and security. Dkt. 120, at 18. To recap, Bernard was initially placed in administrative segregation during his pretrial detention until other inmates were housed on his cell block beginning on October 26, 2013. He was again placed in administrative segregation during his brief post-conviction stay at the jail in 2016.

Bernard submits that the jail had no clear policy for determining when to place detainees on administrative segregation, though he cites to no cases requiring such a policy. The jail is entitled to deference in making these classifications. The safety and security of the jail and its staff are critically important and federal courts will not second guess their security decisions unless the segregation manifests an intent to punish or unless their actions amount to a deprivation of life's necessities. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Supreme Court determined more than forty years ago that "[p]rison administrators therefore should be accorded

24

wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Nothing in the record manifests an intent to punish or a deprivation of life's necessities. On the contrary, the jail placed Bernard in administrative segregation because of his history of violence and escape, and the correctional officers understood that detainees maintain their rights while in administrative segregation.

Bernard also complains that his mental conditions were not sufficiently considered when making the determination to place him on his own cell block. But as stated above, the jail is entitled to deference when making these decisions. Defendants stated that they do generally take mental health into account when making these decisions. And the jail continued to provide Bernard with mental health counseling to deal with his isolation. The undisputed record shows that Kent Wohlrabe periodically met with Bernard for mental health counseling. Furthermore, although the jail should re-evaluate this classification periodically,[8] the record indicates that they did begin placing inmates on Bernard's cell block on October 26, 2013, effectively ending his segregation. To be sure, Bernard was again placed in segregation during his post-conviction proceedings, but that lasted approximately two weeks. Balanced against the need for jail safety and security,

---

[8] "As the district court here rightly explained, we and other circuits have interpreted *Hewitt* as entitling inmates to an 'informal and nonadversary' periodic review (the frequency of which is committed to the discretion of the prison officials) that keeps administrative segregation from becoming a pretext for indefinite confinement." *Isby v. Brown*, 856 F.3d 508, 525 (7th Cir. 2017) (quoting *Westefer v. Neal*, 682 F.3d 679, 684–86 (7th Cir. 2012)).

such a short stay in administrative segregation is imminently reasonable notwithstanding the existence of mental health conditions. *See Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) (explaining that whether prolonged confinement in administrative segregation violates the Eighth Amendment depends on the "duration and nature of the segregation and whether there were feasible alternatives to that confinement").

### D. Discrimination and Religious Liberty Claims

Bernard contends that Defendants discriminated against him because of his status as a pro se litigant and because of his race, and that they deprived him of his right to religious services. Dkt. 19, ¶¶ 73–74. Although Bernard does not fully develop this argument, it appears to be a claim under Equal Protection. Specifically, he alleges that Defendants racially discriminated against him by housing him in segregation away from white inmates. *Id.* ¶¶ 99–100. He further alleges that they left him in segregation because of his status as a pro se litigant. *Id.* ¶ 104. That being said, he does little to show a legal foundation for these claims. Bernard also contends that he should have been permitted to attend religious services with other inmates—as opposed to the one-on-one services—and that such deprivation amounts to constitutional error. *Id.* ¶¶ 112–15. On this point, he appears to argue under the First Amendment, but his argument here again is not well developed.

Defendants contend that the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) bars Bernard's discrimination claims because he failed to exhaust administrative remedies. Dkt. 120, at 19–20. Bernard does not dispute that the

26

PLRA requires such exhaustion. Dkt. 148, at 15. Bernard responds that he was not informed of any procedural requirement beyond what he followed. In support, he cites to *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016), which held that prison officials must inform prisoners about the grievance process. Bernard further contends that such lack of notice exempts him from compliance with the PLRA's exhaustion requirement. Dkt. 148, at 15. But even if the PLRA does not bar Bernard's claims, Defendants are still entitled to summary judgment.

The record shows that Bernard was housed with a white inmate during at least one part of his detention. Furthermore, during much of the remaining time, he was segregated from all inmates, not just the white inmates. As stated above, this classification was warranted. Given this, Bernard has not provided evidence of any actual racial discrimination sufficient to defeat summary judgment.

The same can be said for his status as a pro se litigant. Although the record does not indicate how other pro se litigants were treated, Bernard has not pointed to any evidence sufficient to show that he was actually treated differently because of this status. There appears to be some dispute regarding Defendant Haberkamp and whether she threatened Bernard. Still, in his deposition, Bernard could not recall any instances in which Haberkamp discriminated against him. Bernard Dep. 79:8–80:5. Outside of Lt. Parnow and Chief Klein, he could not recall any conversation with any defendant specifically about his suit.[9] Dkt. 149, ¶ 131. Furthermore, any claim related to Defendant Haberkamp's allege threats or other aggression toward

---

[9] Bernard, in his response to Defendants' statement of undisputed facts, disputed this point but then responded by listing facts that are in no way inconsistent with this point. Dkt. 149, ¶ 131.

Bernard would fall under excessive force and not discrimination. Therefore, he cannot defeat summary judgment on this claim.

Lastly, Bernard also has not produced evidence of any deprivation of his right to the free exercise of his Christian faith. The record shows that Defendants never prevented Bernard from praying and at all times offered him one-on-one religious services. Furthermore, the Constitution does not require that detainees have access to group worship. In *Walker v. Meyers*, the detainee sued because he was deprived of access to group worship services. No. 03 C 50028, 2004 U.S. Dist. LEXIS 26161, at *1 (N.D. Ill. Jan. 3, 2005). There, the Court noted that "plaintiff's claim fails because the only evidence of any limitation on his right to practice his Christian religion was the inability to attend group Bible study for a period of 68 days." *Id.* at 4. The Court determined that group activity is not an essential component of the Christian faith and such deprivation does "not constitute a violation of the First Amendment because he was able to practice his religion in other ways." *Id.* Thus, Defendants are entitled to summary judgment on that claim.

### E. Monell Claim

Bernard challenges the municipality's lack of specific policies under *Monell v. Department of Social Services*, 436 U.S. 658 (1987). He contends that gaps in policy allowed his mental health to go without effective treatment. Dkt. 148, at 17. He contends that the jail did not have an effective policy regarding how to handle inmates that refuse their medications or that request care by a psychiatrist rather than a mental health counselor. He further argues that the jail had no written

28

policy regarding the administrative segregation classification for inmates with mental health disorders. *Id.*

Municipal liability under *Monell* exists only "when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1987)). In *Calhoun*, the Seventh Circuit noted that:

> We have identified three different ways in which a municipality or other local governmental unit might violate § 1983: (1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority."

*Id.* (quoting *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995)). Furthermore, *Monell* liability exists only where plaintiff's constitutional rights were violated, and the defendants were the cause of the deprivation of those constitutional rights. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc). Bernard asserts that a gap in policy led to the violation of his constitutional rights. For this type of *Monell* claim to exist, Bernard must show that "an unlawful practice was so pervasive or systematic that policy-making officials knew of its existence and that their acquiescence to the ongoing practice amounted to a policy decision." *Koval v. City of Chicago*, No 16 CV 7341, 2017 U.S. Dist. LEXIS 58566, at *7 (N.D. Ill. April 18, 2017).

Here, Bernard's claim must fail for multiple reasons. First and as explained above, Bernard has not experienced a deprivation of his constitutional rights. Thus, any gap in municipal policy would have nothing to attach to for the purpose of *Monell*. Second, Bernard has not shown pervasiveness. He contends that he went without effective treatment because the jail did not have a policy covering repeated refusals to take prescribed medication and because of a lack of clear guidance concerning administrative segregation for persons with mental health conditions. But he has not shown any practice that is so pervasive and systematic that it amounts to a policy decision.

Bernard has not shown any large-scale practices at the jail that are sufficient for *Monell*. Correctional officers at the jail noted when inmates failed to take medication. Non-medical staff referred issues to medical staff and relied on their judgment. Inmates had the right to request medical assistance, and Bernard himself was afforded access to mental health counselors and to a psychiatrist in 2013. Furthermore, the jail had an imminently reasonable justification for housing Bernard in isolation notwithstanding his mental health concerns. He had a record of violence and escape and the jail was justifiably worried about safety and security. After a recommendation from the mental health counselor, the jail began housing other inmates in Bernard's cell block starting on October 26, 2013. Even if these complaints were enough to constitute constitutional violations, Bernard

30

has not shown any facts that would make such violations widespread and systematic. Therefore, his *Monell* claims must fail.

### F. Injunctive Relief

Defendants argue that Bernard's requested injunctive relief is moot because he is no longer housed at DeKalb County Jail. Dkt. 120, at 25. Bernard responds he has been back to the jail since 2016 to attend court appearances. Dkt. 148, at 18. He continues that factual disputes exist on the question of whether he will ever again be in the custody of the DeKalb County Jail. Bernard's argument is not persuasive.

Article III of the U.S. Constitution limits federal court's jurisdiction to live cases and controversies. U.S. Const. art. III; *Willis v. Taylor*, No. 14-cv-9150, 2016 U.S. Dist. LEXIS 7364, at *17–18 (N.D. Ill. Jan. 22, 2016). Injunctive relief asks the Court to proscribe Defendants' future conduct. But plaintiffs do not have a legally cognizable interest in the future conduct of jail defendants when that plaintiff no longer resides at the jail. Thus, when an inmate leaves the jail, his or her claim for injunctive relief can no longer be considered live for the purpose of Article III of the U.S. Constitution. *Willis*, U.S. Dist. LEXIS 7364, at *17–18. The only exception is where the plaintiff's return to a defendant's jail is "virtually certain." *Pennie v. County of Winnebago*, No. 96 C 50389, 1997 U.S. Dist. LEXIS 18084, at *9 (N.D. Ill. Nov. 10, 1997).

Bernard is no longer a resident at the jail. He is housed at Dixon Correctional. He contends that he may return to the jail for post-conviction proceedings. But Bernard's pretrial detention ended more than six and a half years

31

ago, and his detention for post-conviction proceedings was almost four and half years ago. As stated above, he now resides at Dixon Correctional serving his sentence for armed robbery. The Court will not speculate regarding possible future visits to the jail. Because Bernard is no longer a resident of the jail, and because the likelihood of his return is not virtually certain, his claims for injunctive relief are dismissed as moot.

### G. Qualified Immunity

Defendants claim they are protected by qualified immunity. That doctrine offers government officials protection "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As the Court noted in *Pearson*, qualified immunity balances two competing interesting. These are (1) "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," and (2) the need to hold those same "public officials accountable when they exercise their power irresponsibly." *Id.*

But qualified immunity is "an immunity from suit rather than a mere defense to liability." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). This is best resolved by summary judgment prior to the commencement of discovery. *Id.* at 231–32 (explaining "that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery") (quoting *Anderson v.*

*Creighton*, 483 U.S. 635, 640 n.2 (1987)). In this later stage of litigation and given that the Court has already held that Bernard's claims cannot lie, resolving the question of qualified immunity does not serve any purpose.

## III. Conclusion

For these reasons, Bernard's claims that accrued before October 23, 2013, are barred by the statute of limitations. Bernard's requested injunctive relief is denied as moot. Furthermore, Defendants' motion for summary judgment regarding the remaining claims [119] is granted, and Bernard's motion for partial summary judgment [132, 137] is denied.

Date:  November 20, 2020

Honorable Iain D. Johnston
United States District Judge
Northern District of Illinois, Western Division